In the Matter of JAMES KRAUSKOPF, Individually and as Commissioner of the New York City Human Resources Administration, et al., Appellants, v CESAR PERALES, as Commissioner of the New York State Department of Social Services, et al., Respondents.

Third Department, July 7, 1988

## APPEARANCES OF COUNSEL

*Peter L. Zimroth, Corporation Counsel (Elizabeth S. Na-*

*trella, Edward F. X. Hart* and *Fay Ng* of counsel), for appellants.

*Robert Abrams, Attorney-General (Clifford A. Royael* and *Peter H. Schiff* of counsel), for respondents.

### OPINION OF THE COURT

MIKOLL, J.

Petitioners are challenging the promulgation by respondent Commissioner of Social Services of an internal ruling of the Department of Social Services (hereinafter DSS) setting forth the standards for determining which individuals are mentally disabled for Medicaid reimbursement purposes; local governmental entities are entitled to 100% reimbursement from respondent State of New York for the care of mentally disabled individuals pursuant to Social Services Law § 368-a (as amended by L 1983, ch 816, § 1). Petitioners sought a declaration that the definition of mentally disabled individuals was not adopted pursuant to procedures set forth in the Social Services Law, was promulgated in violation of the procedures set forth in the State Administrative Procedure Act, is inconsistent with the Social Services Law in that it excludes numerous persons who are mentally disabled, specifically those mentally disabled individuals who receive only State Medicaid benefits, and that it is otherwise arbitrary and capricious. Petitioners also sought injunctive relief forestalling the continued application of DSS' ruling. Supreme Court converted the matter to a CPLR article 78 proceeding challenging the definition developed by DSS for reimbursement eligibility pursuant to Social Services Law § 368-a.

As a result of skyrocketing costs which are attributable to the policy inaugurated by the State in deinstitutionalizing mentally ill patients, the State enacted Social Services Law § 368-a (1) (h) (hereinafter referred to as the Takeover Statute). This measure requires the State to reimburse localities for 100% of the localities' share of the cost incurred for Medicaid services rendered to "those individuals who are eligible pursuant to section three hundred sixty-six of this article as a result of a mental disability as determined by the commissioner in consultation with the commissioner of the office of mental health and the commissioner of the office of mental retardation and developmental disability and with the approval of the director of the budget after first deducting therefrom any federal funds properly received or to be re-

ceived on account thereof" (Social Services Law § 368-a [1] [h]). The Takeover Statute carries no cap on expenditures.

Petitioners' challenge stems from a notification to the New York City Human Resources Administration (hereinafter the HRA), dated January 13, 1984, from DSS stating its intention to use the same standard of mental disability utilized in State Finance Law § 54-i (commonly known as, and hereinafter referred to as, the Overburden Law) for implementation of the Takeover Statute. The standard excludes numerous individuals unless they are eligible for Federal nonparticipating Medicaid benefits as a result of mental disability. Also excluded from reimbursement are mentally ill persons who are currently inpatients in voluntary (private), county or municipal psychiatric hospitals, persons with significant histories of prior hospitalizations in the same institutions and all chronic clients of community-based facilities who have not had at least 45 days of continuing treatment visits in any calendar quarter. Supreme Court dismissed the petition, finding as follows: "the documents show a rational and lawful decision has been made by the respondents to develop the Overburden Law definition and then to carry it forward for use under the Takeover Statute, and this Court will not substitute its opinion for that of respondents where the respondents have not been arbitrary or capricious." Petitioners have appealed.

Addressing petitioners' challenges *ad seriatum,* we first consider whether the Commissioner's failure to formally promulgate the definition of a mentally disabled individual as a rule or regulation violated the State Administrative Procedure Act, which generally provides the public with the right to have notice of and comment upon rules and regulations promulgated by administrative agencies *(see,* State Administrative Procedure Act § 202). The type of rule required to be promulgated in this manner has been defined by the Court of Appeals as follows: "a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers" *(Matter of Roman Catholic Diocese v New York State Dept. of Health,* 66 NY2d 948, 951). State Administrative Procedure Act § 102 (2) (b) (i) excludes "rules concerning the internal management of the agency which do not directly and significantly affect the rights of or procedures or practices available to the public" from the requirement of notice to affected parties.

■ We conclude that even though DSS' definition of a

mentally disabled individual has a profound impact upon the total amount of Medicaid reimbursement the localities will receive from the State for mentally disabled persons, the definition does not directly affect "that segment of the 'general public' over which [the administrative agency] exercises direct authority" *(Matter of Connell v Regan,* 114 AD2d 273, 276; *see, Matter of Jones v Smith,* 64 NY2d 1003, 1005; *People v Cull,* 10 NY2d 123, 129; *cf., Matter of Stuyvesant Polyclinic v Axelrod,* 117 AD2d 99, 100, 102). The definition of a mentally disabled individual is a rule concerning the internal management of DSS and, as such, is not required to be promulgated pursuant to the notice and hearing mandates of the State Administrative Procedure Act.

■ Petitioners' next contention is that DSS violated Social Services Law § 368-a (1) (h) in that it failed to consult with the Commissioner of Mental Health and the Commissioner of Mental Retardation and Developmental Disabilities concerning the establishment of the definition of mentally disabled individuals. We find that a review of the record reveals sufficient interagency consultations in conjunction with DSS' adoption of the definition for use with the Takeover Statute to evidence compliance with Social Services Law § 368-a (1) (h).

Petitioners also contend that DSS' definition of mentally disabled individuals for the purpose of determining State reimbursement for local Medicaid expenditures was arbitrary and capricious in that it excludes large numbers of persons who admittedly may be medically disabled under clinical definitions. Petitioners contend that DSS established a narrow, underinclusive fiscal definition which is not in accordance with the Takeover Statute. The Takeover Statute provides that the State shall reimburse localities for the following: "Beginning January first, nineteen hundred eighty-four, one hundred per centum of the amount expended for medical assistance for those individuals who are eligible pursuant to section three hundred sixty-six of this article as a result of a mental disability as determined by the commissioner in consultation with the commissioner of the office of mental health and the commissioner of the office of mental retardation and developmental disability and with the approval of the director of the budget after first deducting therefrom any federal funds properly received or to be received on account thereof" (Social Services Law § 368-a [1] [h]). Petitioners urge that the language of the Takeover Statute requires State reimbursement for 100% of the cost of medical assistance expended for the

mentally disabled, which includes more than those fitting DSS' definition. While the statute speaks to 100% reimbursement, it refers to those who are *eligible as determined by* the Commissioner in conjunction with the Office of Mental Health, the Office of Mental Retardation and Developmental Disabilities and respondent Director of the Budget. The similarity of the language used in the Takeover Statute with that appearing in the Overburden Law implies that the terms used should be given the same interpretation.

There is also other evidence bearing on the intent of the Legislature in interpreting the Takeover Statute. Both the letter from the bill's sponsor, Senator Tarky J. Lombardi, Jr.,* and the Governor's approval memorandum (1983 NY Legis Ann, at 348) indicate an intention that the Takeover Statute was to focus on fiscal relief to the localities with some programmatic purposes in similar manner to that of the Overburden Law.

We conclude that DSS' definition should be upheld in view of the fact that the standards it used in including and excluding certain categories of mentally disabled persons has a rational basis in light of the financial objectives of the Takeover Statute *(see, Matter of Bernstein v Toia,* 43 NY2d 437, 448; *cf., Matter of Society of N. Y. Hosp. v Axelrod,* 70 NY2d 467, 474). As explained by DSS, its definition included only those discrete groups of mentally disabled individuals who had been perceived by both the Legislature and the Executive as being a financial burden on localities. Its decision to exclude inpatients receiving care at local, general hospitals was motivated by its perception that the fiscal burden of caring for this group did not come from the State's policy of deinstitutionalization but represented a cost which traditionally was shared by the State and local governments. Further, DSS was attempting to avoid providing an incentive to local hospitals to treat many of their medical patients in their psychiatric wings in order to become eligible for State Medicaid reimbursement. DSS' decision to define mentally disabled individuals to exclude patients with 90 days of prior hospitalization in a local hospital, while including patients with 90 days in a State hospital, is rationally justified by the avowed purpose of the Takeover Statute to reimburse localities for

---

* Letter dated July 6, 1983 stating that "the non-federal share of Medicaid services to the mentally disabled will continue to be fully reimbursed as provided by the Human Services Overburden legislation".

burdens created by the State's deinstitutionalization policy. Finally, the exclusion of individuals with less than 45 visits per calendar quarter to community-based day and continuing treatment programs was formulated to allow State reimbursement for those groups which represent a significant financial burden upon localities. The definition employed was calculated to be specific, to provide for successful administrative implementation and also to be affordable. These avowed purposes support the rationality of DSS' actions.

Petitioners contend that the definition unlawfully refuses State reimbursement for local Medicaid expenditures for care provided to mentally disabled individuals unless those persons are also eligible for Federal Medicaid funds. It is clear that the Takeover Statute itself does not express an intention of the Legislature to deny State reimbursement to those mentally disabled persons who are not eligible for Federal Medicaid benefits *(see,* Social Services Law § 368-a [1] [h]). It appears from DSS' explanation that the Federal Medicaid eligibility component of DSS' definition was included to provide incentive to localities to maximize the amount of Federal Medicaid funding received in order to minimize the financial burden on the State and local governments. In view of the fact that the memorandum of the legislation's sponsor stated that the proposed legislation would also "encourage fiscal prudence on the part of local social services districts" (1983 NY Legis Ann, at 348), we conclude that DSS' definition was not unlawful or contrary to Social Services Law § 368-a (1) (h).

█ Respondents challenge the standing of petitioner James Krauskopf, Commissioner of the HRA, who brought the petition in the dual role of Commissioner and as an individual taxpayer. We conclude that Krauskopf does have standing in his role of Commissioner of the HRA in that he makes a claim of entitlement to a specific fund, a proprietary interest, and thus has standing *(see, Matter of City of New York v Lawton,* 128 AD2d 202, 206). Since the proceeding has been converted from one seeking declaratory and injunctive relief to a CPLR article 78 proceeding, he does not have standing as a taxpayer *(see, Matter of Altona Citizens Comm. v Town of Altona,* 77 AD2d 954, *affd* 54 NY2d 908).

KANE, J. P., YESAWICH, JR., HARVEY and MERCURE, JJ., concur.

Judgment affirmed, without costs.